UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

EDGAR DALE BEARDEN                                                        PLAINTIFF

v.                                                   CIVIL ACTION NO. 3:05CV-86-DW

WILLIAM A. BEELER, JR., et al.                                          DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court to resolve the subrogation rights of the Intervening

Plaintiffs, Underwriters Safety and Claims (Underwriters), and C.T. Harris, Inc. (C.T. Harris), in

this personal injury action.  All other claims have been resolved.  The Court has dismissed

Defendants William A. Beeler, Jr., and CLM Freightlines, Inc., based on their settlement will the

Plaintiff.  The settlement provides for a lump sum payment of $625,000 to the Plaintiff, Edgar

Bearden, for his "pain and suffering arising from physical injuries."  Bearden will receive

$400,718.24 of this amount following the deduction of his attorney's fees and costs.

The only question now is whether Bearden's employer, C.T. Harris, and its claims

administrator, Underwriters, are entitled by Georgia law to obtain reimbursement from Bearden

in the amount of $150,000 to recover monies paid for disability benefits.  The answer to this

question depends solely on whether Bearden has been fully and completely compensated for all

his economic and non-economic losses incurred as a result of the injury in accordance with Ga.

Code Ann. § 39-9-11.1(b).

The Court concluded in its prior memorandum opinion of July 12, 2006 (DN 98)

that the law of Georgia determines the subrogation rights of the Intervening Plaintiffs given that

their rights arose from a Georgia employment contract between a Georgia company and a

Georgia resident who received workers' compensation benefits under Georgia law.  <u>See</u> <u>Harris</u>

Corp. v. Comair, Inc., 712 F.2d 1069, 1072 (6th Cir. 1983).  In its prior opinion, the Court

provided a detailed discussion of the controlling Georgia statute, Ga. Code Ann. § 39-9-11.1(b).

(DN 98, pp. 11-17).  The Court sees no purpose in restating this discussion in its entirety.  The

same principles of Georgia law explained in the prior opinion still apply with full force.

       C.T. Harris and Underwriters have the burden under Georgia law to establish that

Edgar Bearden has been fully and completely compensated.  Georgia Electric Membership Corp.

v. Garnto, 597 S.E.2d 527, 529-30 (Ga. 2004); Anthem Cas. Ins. Co. v. Murray, 542 S.E.2d 171,

173-74 (Ga. App. 2000) ("The insurer bears the burden of proving that the insured has been ...

[fully and completely] compensated....").  The determination of whether an employee has been

fully and completely compensated is a factual determination that will not be set aside unless

clearly erroneous.  Canal Ins. Co. v. Liberty Mut. Ins. Co., 570 S.E.2d 60, 65-67 (Ga. App. 2002)

("Thus, unless clearly erroneous, this Court must deter to the trial court's determination of this

factual determination.") (citing Hartford Ins. Co. v. Fed. Ex. Corp., 559 S.E.2d 530 (Ga. App.

2002)).  Resolution of this issue is made by "comparing the sum of Workers' Compensation

benefits paid by the intervenor [plaintiff] and the amount of the employee's recovery in the third-

party action, to all economic and non-economic losses caused by the injury."  Georgia Electric

Membership Corp., 597 S.E.2d at 529-30 (citing City of Warner Robbins v. Baker, 565 S.E.2d

919 (Ga. App. 2002)).

       By mutual agreement of the parties, the Court makes its decision based on the

briefs and affidavits submitted on the record (DNs 103, 104, 105 106).

## I.    The Material Facts.

Edgar Bearden was born December 1, 1964, and was 38 years old at the time of the motor vehicle accident that occurred on January 23, 2003.  A high school graduate, Mr. Bearden's employment history included work as a warehouseman, a construction worker, and a truck driver.  At the time of the wreck, Bearden had worked as a driver for C.T. Harris for approximately three years and six months.  His average weekly wage was the $795.32, of which $137.64 was deducted for health, dental, life, disability and accident insurance for Bearden, his wife and their two children.  Bearden lost all of these insurance benefits after he was terminated from employment with C.T. Harris on August 21, 2003, due to his injuries and resulting limitations.

Dr. James Chappius, a board-certified orthopedic surgeon, initially treated Bearden for the accident-related injuries.  Dr. Chappius diagnosed Bearden with the following injuries as a result of the three tractor-trailer accident:  (1) lateral and medial meniscus tears of the right knee; (2) a full thickness tear of the rotator cuff of the right shoulder; (3) lumbar strain; (4) lateral epicondylitis of the right elbow; and (5) early degenerative arthritis of the affected right knee (DN 104, Exh. 3, Aff. p. 2).  Dr. Chappius performed three surgeries on Bearden to treat these injuries.  The procedures included one surgery on the right knee to repair the meniscus tears and two surgeries on the rotator cuff of the right shoulder.  The second shoulder surgery was needed after Bearden suffered a second reoccurring "massive tear" of the rotator cuff.

Following this second shoulder surgery, Dr. Chappius referred Bearden to a shoulder specialist, Dr. Robert Karsch, for further treatment of the right shoulder.  Dr. Karsch

3

agreed with Dr. Chappius's diagnosis of massive reoccurring rotator cuff tears in the right

shoulder.  He performed a third shoulder surgery, an open repair of the rotator cuff tear with

distal clavicle resection, on March 8, 2005.  Dr. Karsch continued to treat Bearden through April

17, 2006, at which time he discharged Bearden as further surgery would not improve his

condition.

        Dr. Karsch in his affidavit calculated Bearden's permanent impairment rating to

be a 28% upper body extremity impairment resulting in a 17% impairment of the whole person

as determined by the Fifth Edition of the AMA Guidelines.  According to the doctor, Bearden is

permanently restricted from using his upper right extremity to lift more than two pounds or to

perform any repetitive overhead activities.  Bearden also is restricted to no pushing, pulling,

climbing or crawling and must be permitted to use a sling or brace if needed.

        Dr. Chappius resumed Bearden's treatment in April of 2006, at which time he

determined that Bearden's medical condition had reached maximum medical improvement.  Dr.

Chappius calculated that Bearden has an 8% permanent impairment rating for his lumbar spine,

2% for his elbow and 4% permanent impairment for his right knee.  Dr. Chappius also imposed

certain restrictions on Bearden as a result of his injuries.  The doctor restricted Bearden from

lifting more than 15 pounds with his affected arm and precluded him from performing any

repetitive activities or any work above shoulder level with his right arm.  He restricted Bearden

from performing any stooping, twisting, crawling or bending (DN 143, Exh. 3, Aff. p. 4).

        Both Dr.  Chappius and Dr. Karsch conclude that Bearden will require future

surgical treatment of his knee and shoulder injuries.  Dr. Chappius is of the opinion that Bearden

will require a total knee replacement of his right knee.  Given Bearden's current age of 42 years,

4

and the 15-year effective life of such a replacement, Dr. Chappius concludes that Bearden will "require at least one, and possibly two, total knee replacements on his right [knee] during his lifetime." (DN 143,Exh. 3, Aff. p. 2). Such knee replacement surgery will require additional inpatient care, along with outpatient followup of physical therapy and diagnostic imaging, according to the doctor.

Dr. Karsch has diagnosed Bearden with degenerative joint disease in his right acromioclavicular joint as a result of Bearden's accident-related shoulder injury. It is Dr. Karsch's opinion within a reasonable medical probability that Bearden may require further surgeries for his shoulder including an open rotator cuff repair along with a total shoulder replacement or fusion of the shoulder joint (DN 104, Exh. 2, Aff. p. 4).

Dr. Karsch concludes based on his examination of Bearden and Bearden's report of his symptoms, that Bearden experiences a moderate amount of pain on an ongoing basis as a result of his shoulder injury. The doctor has no reason to believe that this pain will improve, and in fact it may worsen over time (Id.). Dr. Chappius continues to provide pain management to Bearden, who "experiences regular pain at a level of 6-8 on a scale of 1-10, with 10 being the worst pain one can have." (DN 104, Exh. 3, Aff. pp. 3-4). According to Dr. Chappius, Bearden experiences this level of pain despite the daily prescription pain medication he takes. Bearden takes 200 mg. of Celebrex each day and four 10 mg. Percocet tablets daily.

Bearden avers in his affidavit that he is never totally out of pain. He cannot sleep uninterrupted through the night without his pain awakening him. As a result, Bearden takes catnaps during the day while at home. He has not been able to obtain employment since his injuries. Although he was previously a physically active adult who hunted, fished, cut firewood,

5

played sports with his daughter, and worked on automobiles, Bearden is now restricted by the injuries to his knee and dominant arm to primarily indoor activities.  He cannot stand for more than 30 minutes at a time without experiencing throbbing knee pain.  His knee frequently gives way unexpectedly.  Use of his right arm is limited to lifting only about 5 lbs.  He cannot raise his elbow above chest level.  As a result of these limitations, Bearden's wife, who was previously a housewife, has been forced to obtain employment while Bearden remains home.  Bearden consequently has become depressed and has previously sought psychological counseling due to his feelings of inadequacy and depression.

Bearden's wife, Kathy Bearden, also supplied her affidavit.  In her affidavit, Mrs. Bearden indicates that prior to his accident, her husband was extremely active and performed all of the yard work, fished, and played sports with his daughter.  Since his injury, he is unable to work or take care of the yard.  Kathy now works full-time while her husband Edgar remains at home doing light housework.

Mrs. Bearden stated that although her husband previously had been easygoing, he now becomes easily agitated due to his physical limitations. He cannot play sports with his daughter or go fishing with her.  His sisters and other family members now are needed to help the Bearden family.  James Grantham confirmed in his affidavit that since Dale Bearden's accident, Grantham regularly helps with the yard work several times a week (DN 104, Exh. 11, Aff. p. 1).  Prior to the accident, Bearden did all of his own yard work and work on the house.

The economic impact of Bearden's injuries was analyzed by labor economist, Dr. Ronald Missun, Ph.D., and vocational economic analyst, John Tierney, M.A.  (DN 104, Exhs. 5, 6, Affs.).  Georgia attorney, Clifford C. Perkins, Jr., who specializes in workers' compensation

law, also explained the benefits that Bearden is entitled to receive under Georgia law during the remainder of his life.  (DN 104, Exh. 7, Aff.).

Review of the Perkins affidavit reveals that Bearden's average weekly wage prior to January 23, 2003, was $795.32.  Under Georgia law, Bearden was entitled to the lesser of two-thirds of this amount or $400 per week.  Bearden has drawn $400 per week since January 24, 2003, for a weekly loss of income of $395.32.  Georgia law provides that one year after an injured worker's treating physician has released the patient to return to work the amount of weekly workers' compensation benefits may be reduced from $400 per week of temporary total disability to the amount of $268 per week for total partial disability.

C.T. Harris has filed notice pursuant for Form WC-104 that Bearden's weekly payment will be reduced from $400 to $268 effective on June 1, 2007.  This temporary partial disability is limited to 350 weeks, after which the injured employee is eligible to begin to draw permanent partial disability.  Bearden's total partial disability will expire not later than October 8, 2009.  After this date, Bearden may begin to draw permanent partial disability.  If the impairment ratings of his treating physicians are accepted,[1] Bearden will receive 91.5 weeks of permanent partial disability benefits at $400 per week, for a total of $36,600 (DN 104, Exh. 9, Aff. p. 3).

Dr. Missun and John Tierney have evaluated the loss of lifetime earnings sustained by Bearden due to his injury in January of 2003 (DN 104, Exhs. 7, 8).  Dr. Missun has calculated Bearden's pre-injury and post-injury annual earning capacities along with his pre-

---

[1] C.T. Harris as Bearden's employer has the right to obtain independent medical examinations to argue for lower impairment ratings to be used to calculate Bearden's disability benefits.

7

injury and post-injury work life expectancies and fringe benefit rate.  Dr. Missun and Tierney

calculate that in present dollars Bearden has suffered a lifetime loss of earnings in the amount of

$729,448.  Their analyses reveals a pre-earning capacity of $50,487 per year based on Bearden's

earnings while employed as a truck driver at C.T. Harris from 2000 through 2003.  Bearden's

pre-injury work life expectancy was 20.1 years based on his age, education and absence of prior

work-related disability.  In contrast, Bearden's post-injury earning capacity is $39,338 per year

with a post-injury work life expectancy of 10.9 years based on the same factors.  These numbers

reduce to a present economic loss of $729,448 based on Bearden's reduced earning capacity and

work-life expectancy.

       Laura Lampton, a certified nurse life care planner with vocational economics

developed a medical life care plan for Bearden based upon a review of his medical records and

communications with various medical professionals involved in Bearden's care.  Based on her

review of this information, Lampton produced a report in which she calculated that should

Bearden require a shoulder replacement or shoulder fusion, his anticipated total medical

expenses will range between $265,713 and $329,176 (DN 104, Exh. 6, p. 7).

       Underwriters, as third party administrator for C.T. Harris's workers'

compensation program, has provided the affidavit of his claims adjustor, Michael Egan.  Egan is

responsible for managing workers' compensation claims filed against C.T. Harris.  He also is in

charge of making all payments for medical and income benefits on such claims (DN 105, Exh. 1,

Aff. pp. 1-2).  Egan confirms that as a result of the accident on January 23, 2003, C.T. Harris has

paid Bearden weekly income benefits of $400 per week since the date of the accident, for a total

of $84,848.72 in income benefits as of the date of Egan's affidavit (Id.).  Egan avers in his

8

affidavit that in addition to the above-mentioned benefits previously paid, Bearden is entitled to receive $61,200 in future income benefits.  This amount may increase *if* Bearden is able to establish that his injuries are catastrophic, in which case his $400 per week income benefit will be extended until age 65.[2]  The past and future income benefits paid to Bearden are not subject to income taxation (Id. at p. 2, ¶ 9).

In addition to income benefits, C.T. Harris also has paid $80,726.20 in medical expenses arising from treatment of Bearden's work-related accident.  Egan agrees that if the disability ratings issued by Dr. Karsch and Dr. Chappuis are used, C.T. Harris will be required to pay a total of $37,200 for permanent partial disability benefits to Bearden.

Egan concludes his affidavit by noting that Bearden has reached maximum medical improvement and is no longer actively treating with any physician for his injuries from the accident.  Should he incur future medical expenses arising from injuries sustained in the accident, C.T. Harris will be obligated under Georgia law to pay such expenses for Bearden's medical treatment.  C.T. Harris and Underwriters offer no other proof beyond the affidavit of Michael Egan.

## II.  Legal Analysis.

The Court has carefully examined all of the affidavits, reports and arguments provided by the parties.  Review of these documents persuades the Court that C.T. Harris and

---

[2]  Egan explains that under Georgia workers' compensation law, an injury is deemed catastrophic if the affected worker is able to prove that he or she cannot perform his or her prior line of work and an insufficient number of jobs exist in the national economy that he or she remains capable of performing given his or her work restrictions.

Underwriters have failed to carry their burden under Ga. Code Anno. § 35-9-11.1(b) of proving that Bearden has been fully and completely compensated for all of his economic and non-economic losses incurred as a result of his injuries.  See <u>Canal Ins. Co. v. Liberty Mut. Ins. Co.</u>, 570 S.E.2d at 66 (Only if a trial court determines that the employee has first been made whole does it have the authority to reduce the employee's general award, including personal injuries, to cover the subrogated lien.) (citing <u>Powell v. Daniels Const. & Demolition</u>, 501 S.E.2d 578 (Ga. App. 1998)).

Georgia's public policy is strongly supportive of the complete compensation rule contained in § 34-9-11.1(b).  The Georgia Workers' Compensation Act is "highly remedial" in nature and "must be construed liberally in favor of the claimant in order to accomplish its beneficent purposes."  <u>Homebuilders Assoc. of Georgia v. Morris</u>, 518 S.E.2d 194, 196 (Ga. App. 1999).  Here, Bearden is to receive as the proceeds from the settlement the net amount of $400,718.24.  In addition to this settlement, he has received past income benefits of $84,848 and will receive, according to Egan, future income benefits of $61,200.  When these amounts are added together, Bearden will have received $546,048 in compensation once his future income benefits are paid out.  His calculated present economic loss, without consideration of his pain and suffering, is calculated by Dr. Missun and Tierney to be $729,448 in present value.

Obviously the amount of present economic loss confirms that Bearden has not been fully and completely compensated, even when one considers only his economic losses without taking into account his pain and suffering.[3]  Thus, based solely upon economic loss, C.

_____

[3]  A straightforward comparison of Bearden's pre-injury weekly wage of $795.32 to the $400 maximum weekly income benefit available under Georgia workers' compensation law readily confirms a net loss of $395.32 per week.  C.T. Harris and Underwriters suggest in their

T. Harris and Underwriters subrogation claims must be dismissed because Bearden has not been fully and completely compensated.  <u>See</u> <u>Canal Ins. Co.</u>, 570 S.E.2d at 65-67 ("Where prior weekly lost wages exceeded the amount paid weekly for disability, the insurer was not entitled to a subrogation lien because the employee had not been fully compensated by the recovery.").  <u>See also</u> <u>City of Warner Robbins</u>, 565 S.E.2d at 922-23 (Injured plaintiff who received net settlement of $58,725.80 as the result of work-related accident was not fully and completely compensated where plaintiff had undergone two back surgeries, incurred medical expenses of $135,000 with the possibility of future expenses, had become depressed and suicidal).

The Court has limited its analysis solely to an evaluation of the economic losses suffered by Bearden.  Bearden has offered an alternative basis on which to dismiss the subrogation lien of the Intervening Plaintiffs.  Bearden argues that the lien cannot attach to the proceeds of his settlement given that the settlement is limited by its express terms to compensation for non-economic loss for "pain and suffering arising out of physical injuries...." (DN 104, p. 1).

It is a basic principle of Georgia workers' compensation law that a subrogation lien may not be asserted against non-economic damages.  <u>Canal</u>, 570 S.E.2d at 65 ("Neither the employer nor the insurer can assert a subrogation lien against non-economic damages, *i.e.*, pain and suffering, where, under the Act, no non-economic benefits were paid.").  <u>See also</u> <u>Hammond</u>

---

statement of the case that the $400 amount is not subject to taxation and therefore represents a substantially higher gross weekly income.  Neither C.T. Harris nor Underwriters has made an attempt to calculate the gross amount of weekly income that Bearden would have to earn to generate a weekly net income of $400.  Without such calculation, the affidavit cannot support C.T. Harris and Underwriters' burden of proof.  <u>See</u> <u>CGU Ins. Co. v. Sabel Industries, Inc.</u>, 564 S.E.2d 836, 840-41 (Ga. App. 2002) (Expert's testimony was deficient to support employer's burden of proof where essential facts were not included in the expert evaluations).

v. Lee, 536 S.E.2d 231 (Ga. App. 2000) (same); 12 Ga. Jur. Workers' Compensation § 5:7

(2006) ("No subrogation lien can be asserted against non-economic damages, *i.e.*, pain and

suffering, because, under the Workers' Compensation Act, no such benefits are paid.  Allowing a

subrogation lien against a recovery for non-economic damages would leave the injured employee

uncompensated for the non-economic loss.").

        Although the Court does not rest its decision on this argument, the holding of the

above-cited cases would apply with equal force to the facts of the present case and warrant

dismissal where the entire settlement amount is designated to compensate Bearden solely for his

"pain and suffering arising from physical injuries...." (DN 104, p. 1).  The Court, however, need

not rest its decision on this separate argument, as the comparative analysis of the economic loss

suffered by the Plaintiff clearly shows that Bearden has not been fully and completely

compensated within the meaning of Ga. Code Anno. § 34-9-11.1(b).  Consequently, the

subrogation claims of the Intervening Plaintiffs must be **DISMISSED WITH PREJUDICE** as

provided in the accompanying order.

Copies to Counsel of Record